### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MONIKA MADORIYA,<br><br>                        Plaintiff,<br><br>v.<br><br>POLLACK, POLLACK, ISAAC &<br>DECICCO, LLP, and CONRAD POLLACK,<br><br><br>                        Defendants. | Case No.: 1:25-cv-7253<br><br><br>**COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff, MONIKA MADORIYA ("Ms. Madoriya") by and through her undersigned counsel, brings this action against Defendants POLLACK, POLLACK, ISAAC & DECICCO, LLP ("PPID") and CONRAD POLLACK ("Mr. Pollack") (collectively the "Defendants") (Ms. Madoriya and Defendants collectively referred to herein as the "Parties"), and alleges as follows:

### PRELIMINARY STATEMENT

1.      This case arises from the blatant and unlawful discrimination, retaliation, and benefit interference inflicted upon Ms. Madoriya, an accomplished Indian woman and immigration paralegal, by her former employer, PPID and its senior managing attorneys.

2.      Ms. Madoriya excelled in her role for more than six years, earning praise from supervisors and clients alike, and generating substantial revenue for the firm. But, just four days after disclosing her pregnancy to the company and requesting information about maternity leave, she was abruptly terminated.

3.      At the very moment she most needed stability, Defendants stripped Ms. Madoriya not only of her livelihood but also of her ability to claim maternity leave and health insurance benefits—deliberately timed to deprive her of a critical prenatal medical procedure and harm her pregnancy. This bad-faith cancellation of benefits caused Ms. Madoriya immense stress and forced her to forego essential prenatal care.

4.      When her child was ultimately born undersized and with health complications, Ms. Madoriya endured not only economic and emotional distress, but also profound anguish at the knowledge that Defendants' actions contributed directly to her baby's suffering.

5.      Defendants' conduct was not an isolated act of poor judgment; it was intentional, unlawful, and calculated to cause harm. Ms. Madoriya was targeted because of her pregnancy, sex, and Indian national origin, and was further punished for standing up to discriminatory treatment and pointing out the hostilework environment created by her employer.

6.      Accordingly, Ms. Madoriya brings this action to hold to hold Defendants accountable under federal, state, and city law, for damages arising from Ms. Madoriya's injuries and to ensure that no other employee and prospective mother at PPID is subjected to such shockingly callous and illegal treatment.

## NATURE OF THE ACTION

7.      This is an action for discrimination, retaliation, failure to accommodate, and unlawful interference with employee benefits. Ms. Madoriya, a former Business Immigration Paralegal at PPID with a stellar record as a high performing employee, which was routinely recognized by her supervisors, was unlawfully terminated within days of disclosing her pregnancy and requesting maternity leave paperwork and was immediately stripped of her health insurance coverage at a critical stage of her pregnancy.

8.      Ms. Madoriya brings claims for pregnancy, sex, and national origin discrimination, retaliation, and failure to provide reasonable accommodations in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") (42 U.S.C. § 2000e), as amended by the Pregnancy Discrimination Act of 1978 ("PDA"), the Pregnant Workers Fairness Act ("PWFA") (42 U.S.C. § 2000gg), and the Family and Medical Leave Act ("FMLA") (29 U.S.C. §§ 2601-2654).

9.      Ms. Madoriya also brings claims under the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"), which provide independent and broader protections against discrimination and retaliation.

10.     Ms. Madoriya further brings claims under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001 et seq. ("ERISA"), including claims for unlawful interference with protected benefit rights (ERISA §510, 29 U.S.C. §1140), for recovery of benefits under ERISA §502(a)(1)(B), 29 U.S.C. §1132(a)(1)(B), and for Defendants' failure to provide required continuation coverage notice under the Consolidated Omnibus Budget Reconciliation Act ("COBRA") 29 U.S.C. §§1161–1169,

11.     Ms. Madoriya seeks declaratory relief, compensatory and punitive damages, costs of this action, and other equitable and injunctive relief to remedy Defendants' unlawful conduct.

## JURISDICTION & VENUE

12.     This Court has subject matter jurisdiction over Ms. Madoriya's claims pursuant to 28 U.S.C. §§1331 and 1343 because this action arises under federal law, including Title VII, ERISA, and COBRA.

13.     This Court also has jurisdiction over Ms. Madoriya's claims under ERISA pursuant to 29 U.S.C. §1132(e)(1) and related provisions, which provide federal courts with exclusive

jurisdiction over civil actions brought by plan participants to enforce rights under employee benefit plans.

14.     This Court has supplemental jurisdiction over Ms. Madoriya's state and city law claims pursuant to 28 U.S.C. § 1367, as those claims are so related to her federal claims that they form part of the same case or controversy.

15.     This Court has personal jurisdiction over Defendant PPID because PPID is a limited liability partnership duly organized and registered under the laws of the State of New York, maintains its principal place of business within the Southern District of New York, and conducts substantital business in the State of New York. In addition, the acts giving rise to Ms. Madoriya's claims occurred in New York.

16.     This Court has personal jurisdiction over Defendant Mr. Pollack because, upon information and belief, he resides in the State of New York, conducts substantial business in New York as a Managing Partner and supervising attorney at PPID, and participated in acts giving rise to Ms. Madoriya's claims in New York.

17.     Venue is proper in this District under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391 because Defendants are located in, reside in and conduct business in New York County, the events giving rise to these claims all occurred within this District, the unlawful employment practice was committed in this District, the relevant employment records are maintained in this District, Ms. Madoriya would have worked in this District but for the Defendants' unlawful employment practices, PPID has its principal office in this District, and there is no other District that has a substantial connection to the claim.

## CONDITIONS PRECEDENT

18.     On April 23, 2025, Ms. Madoriya timely filed charges of pregnancy, sex, national origin discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC").

19.     On June 2, 2025, the EEOC issued Ms. Madoriya a Notice of Right to Sue (the "EEOC Notice"). This Complaint has been filed within 90 days of Plaintiff's receipt of the EEOC Notice. A true and accurate copy of the EEOC Notice is attached hereto as **Exhibit A**.

20.     Ms. Madoriya has fully complied with all prerequisites to jurisdiction in this Court under Title VII and the PWFA.

21.     Ms. Madoriya's claims under ERISA and COBRA do not require exhaustion of administrative remedies before the EEOC or any other agency and are properly before this Court pursuant to 29 U.S.C. §1132(e)(1).

## PARTIES

22.     Plaintiff, Ms. Madoriya, is an individual and citizen of New York, New York.

23.     Defendant, PPID, is a law firm organized under the laws of New York with its principal office located in New York, New York. At all relevant times, PPID employed more than 20 employees and maintained a group health plan within the definitions set forth in ERISA.

24.     Defendant, Mr. Pollack, is a Founding and Managing Partner at PPID. At all relevant times, he exercised authority and control over the terms and conditions of Ms. Madoriya's employment, including the decision to terminate her.

## FACTUAL ALLEGATIONS

### Background

25.     Ms. Madoriya began working for PPID as a Business Immigration Paralegal in or about June 2018.

26.     Over the course of her six years of employment at PPID, Ms. Madoriya performed her duties competently and consistently received positive feedback regarding her performance, excelling in her role by every measure.

27.     By way of example, Ms. Madoriya cultivated valuable relationships with prospective clients, especially among New York's Hindu community, to which she belongs, who she then referred to PPID.

28.     In fact, during her tenure at PPID, Ms. Madoriya referred approximately 19 clients to the firm, whose cases generated approximately $100,000.00 in revenue for PPID, further reflecting the value Ms. Madoriya brought to PPID.

29.     Further, Mr. Pollack always tasked Ms. Madoriya with working on the clients' cases whom she referred, from the case's inception to its end, again emphasizing Ms. Madoriya's diligent and dependable work ethic and strong performance.

30.     Moreover, in recognition of Ms. Madoriya's exceptional work, her supervisors at PPID tasked her with completing and filing approximately 20-25 applications for clients seeking visas through the H-1B lottery system each year, which is no small feat given the challenges of the H-1B lottery system.

31.     Ms. Madoriya's irrefutably strong performance is not only reflected by the revenue she generated for PPID, and the rigorous workload she was given to manage, but is further corroborated by the consistently positive feedback she received from her supervisors, including Mr. Pollack, and most importantly to Ms. Madoriya, the glowing reviews her clients consistently gave her online and in person.

32.     However, despite bringing untold value to PPID over the course of six years, PPID swiftly terminated Ms. Madoriya on September 9, 2024, a mere **four days** after she disclosed her pregnancy to PPID's Office and Human Resources ("HR") Manager, and approximately nine months after Ms. Madoriya lodged a protected complaint regarding one of her supervising attorneys, Ms. Alexandra Bondikov ("Ms. Bondikov").

33.     Specifically, in approximately January 2024, Ms. Madoriya informed PPID's former HR Manager that her supervisor, Ms. Bondikov, engaged in discriminatory conduct targeting her because of her Indian background and national origin, as well as that of two other colleagues.

34.     On September 9, 2024, when Ms. Madoriya requested that Mr. Pollack identify any explanation or support for Defendants' decision to transparently discriminate against her and and retaliate against her by termination, he only mustered vague references to performance issues raised by Ms. Bondikov that purportedly began in late 2023 but were at no time ever brought to Ms. Madoriya's attention.

35.     Given that PPID never informed Ms. Madoriya of any performance issues, despite her repeatedly asking for a formal performance evaluation since March 2024, coupled with Ms. Madoriya's complaint regarding Ms. Bondikov in January 2024 and the disclosure of her pregnancy, PPID's stated reasons for firing Ms. Madoriya are pretextual on their face and thinly conceal the firm's unlawful motives.

36.     Ms. Madoriya was never issued any verbal or written discipline.

37.     She was never placed on a PIP.

38.     Before her September 9, 2024 conversation with Mr. Pollack, Ms. Madoriya had not been notified of performance issues.

39.     Ms. Madoriya was given *zero* opportunity to correct or even to address her alleged "performance issues."

40.     Ms. Madoriya was not provided with any details regarding her "performance issues."

**Ms. Bondikov's Discriminatory and Retaliatory Treatment of Ms. Madoriya Based on National Origin and Following Ms. Madoriya's Complaint**

41.     In or around October 2019, Ms. Bondikov bizarrely and tactlessly asked Ms. Madoriya—who is Indian—to which caste within the traditional Indian caste system she belonged. This needless exchange was utterly belittling and humiliating to Ms. Madoriya, and made her feel very small indeed.

42.     As Ms. Madoriya would later explain to Ms. Bondikov, the caste system is an outdated hierarchical social structure in India that marginalizes and discriminates against Indians based on wealth, birth, social, economic status, and profession, among other things.

43.     Indeed, the caste system has historically been used to stereotype individuals, with those in "lower" castes being subjected to racism, discrimination, and segregation.

44.     For these reasons, inquiries as to an Indian person's caste are considered discriminatory, highly offensive, and inappropriate—and even more so in an employment context.

45.     Despite the deeply offensive nature of Ms. Bondikov's question as to which caste Ms. Madoriya belonged, Ms. Madoriya reluctantly answered, hoping Ms. Bondikov would never bring castes up again.

46.     Unfortunately, just seven months later in May 2020, an unrepentant Ms. Bondikov asked Ms. Madoriya which caste another former Indian attorney at PPID belonged to, having learned nothing from previous interactions and displaying a complete lack of awareness.

47.    Considering this to be an opportunity to educate Ms. Bondikov, especially in light of her prior inquiries in October 2019, Ms. Madoriya explained to Ms. Bondikov that questions regarding an Indian person's caste are considered offensive and inappropriate and make Indians, such as Ms. Madoriya, deeply uncomfortable.

48.    At first, Ms. Madoriya believed Ms. Bondikov understood why her questions regarding castes were offensive, but over the months that followed, it became clear that the lesson was lost on Ms. Bondikov.

49.    Specifically, in approximately December 2023 (around the time Ms. Madoriya's work performance allegedly began to suffer), Ms. Bondikov mentioned to Ms. Madoriya that she did not like another Indian attorney at PPID because she believed he acted "very entitled" in PPID's office.

50.    Incredibly, Ms. Bondikov then asked Ms. Madoriya whether the other Indian attorney belonged to a "higher" caste because of the "entitled" way he carried himself.

51.    In response, Ms. Madoriya confronted Ms. Bondikov, again explaining that it was highly offensive for Ms. Bondikov to ask about an Indian person's caste. She again requested that Ms. Bondikov cease all such inquiries going forward.

52.    Fed up with Ms. Bondikov's discriminatory and offensive inquiries regarding Ms. Madoriya's and her Indian colleagues' castes, Ms. Madoriya lodged a complaint against Ms. Bondikov in January 2024 with the then-PPID HR Manager.

53.    However, upon information and belief, PPID did nothing to address Ms. Bondikov's behavior and the matter was never brought up again by PPID or the HR Manager.

54.    PPID's ignoring Ms. Madoriya's complaint was an effective endorsement of Ms. Bondikov's behavior. It signaled to Ms. Bondikov and to other PPID employees that discriminatory

conduct would be tolerated, even when it was highly offensive, repeated, and when the mistreated parties complained.

55.     Unfortunately, immediately after Ms. Madoriya confronted Ms. Bondikov and complained to HR, Ms. Bondikov became palpably more hostile towards Ms. Madoriya and the strong working relationship they had for the previous five years noticeably soured.

56.     For example, Ms. Bondikov noticeably began limiting her interactions with Ms. Madoriya by ignoring her requests for a more diverse caseload and assigning work to other paralegals, thereby isolating Ms. Madoriya at the Firm.

57.     These actions were part of a pattern of retaliatory acts committed by Defendants.

58.     In fact, prior to Ms. Madoriya's complaint, Ms. Bondikov had ordinarily waived PPID's standard $200.00 consultation fee for clients Ms. Madoriya brought to the Firm; however, after Ms. Madoriya's complaint, Ms. Bondikov ceased extending this small courtesy to the clients Ms. Madoriya referred to PPID.

59.     Additionally, when Defendants terminated Ms. Madoriya on September 9, 2024, Mr. Pollack informed her that Ms. Bondikov had complained of a precipitous drop in the quality of Ms. Madoriya's work beginning in late 2023, which was around the same time Ms. Madoriya confronted Ms. Bondikov regarding her discriminatory inquiries concerning the caste system, and a short time before Ms. Madoriya's protected complaint.

60.     However, this strains credulity given Mr. Pollack gave Ms. Madoriya a glowing review in April 2022 (the last time Ms. Madoriya received a formal performance evaluation), during which Mr. Pollack told Ms. Madoriya that she "does good work" and "brings a lot to the table."

61.    Additionally, in or around December 2023, Mr. Pollack sent Ms. Madoriya an email, calling her a "very solid employee."

**Ms. Madoriya's Pregnancy Announcement**

62.    In July 2024, Ms. Madoriya learned that she was pregnant with her first child.

63.    Elated, Ms. Madoriya shared the news with PPID on September 5, 2024, after successfully completing her first trimester.

64.    That same day, Ms. Madoriya also requested PPID's Office and HR Manager to provide her with paperwork reflecting the maternity leave options available to her under all applicable laws and PPID's internal policies.

65.    Initially, the HR Manager expressed excitement at the news and notified Ms. Madoriya that she would provide the requested paperwork by the end of the week.

66.    However, by September 8, 2024, Ms. Madoriya had not received the paperwork nor any further updates from HR, which reflected PPID's disdain for Ms. Madoriya's pregnancy-related needs.

**Defendants' Discriminatory and Retaliatory Termination of Ms. Madoriya**

67.    On September 9, 2024, Ms. Madoriya called Mr. Pollack seeking information on a work-related assignment.

68.    During that conversation, Mr. Pollack also requested Ms. Madoriya meet with him in his office approximately one-and-a-half hours later.

69.    At the time, Ms. Madoriya believed the meeting was regarding her maternity leave and to address Ms. Madoriya's repeated efforts to schedule her performance evaluation, which Ms. Madoriya had been requesting since March 2024.

70.    Upon Ms. Madoriya's arrival at Mr. Pollack's office, Mr. Pollack was busy speaking on the phone.

71.    While Ms. Madoriya waited, the HR Manager entered Mr. Pollack's office and met with him for approximately ten minutes.

72.    Once the HR Manager finished speaking with Mr. Pollack, he called Ms. Madoriya into his office and advised Ms. Madoriya that PPID was terminating her effective immediately without severance. She was then ordered to immediately pack her things in her office and leave the premises.

73.    Shocked at this unexpected news, Ms. Madoriya reminded Mr. Pollack and the HR Manager that she was three months pregnant, that she had just recently disclosed her pregnancy and that she had requested information regarding the Firm's maternity leave policy just days before.

74.    Incredibly, the HR Manager confirmed Ms. Madoriya had disclosed her pregnancy days prior, but Mr. Pollack reaffirmed that the Firm's decision to terminate Ms. Madoriya was final, stating "this is our decision."

75.    Upon hearing Defendants' confirmation that (1) she had only recently announced her pregnancy and that (2) her employment had indeed been terminated, Ms. Madoriya understandably became emotional, pointing out to Mr. Pollack and the HR Manager that with a baby on the way, she was reliant on her salary and health insurance.

76.     In response, Mr. Pollack recommended Ms. Madoriya "use the unemployment"—a callous reference to the unemployment benefits Ms. Madoriya was now eligible to receive from New York State as a direct result of her unlawful termination.

77.     Distraught, nauseous and crying, Ms. Madoriya rushed to her office to pack her things. As she was packing,  a law firm clerk came to Ms. Madoriya's office and told her that the firm was pushing the clerk to make sure that Ms. Madoriya packed her things quickly and left the premises as soon as possible, not even giving her a chance to say goodbye to her beloved friends and colleagues with whom she had a great relationship over her six year tenure at PPID.

78.     The fact that Defendants terminated Ms. Madoriya almost immediately after she notified the Firm of her pregnancy and made it clear that she intended  to take maternity leave, and nine short months after complaining of Ms. Bondikov's discriminatory conduct, smacks of discriminatory animus.

79.     In other words, it is clear that Ms. Madoriya's protected report of Ms. Bondikov's continued discriminatory comments protected disclosure of her pregnancy, and request for information regarding available maternity leave motivated PPID's decision to terminate Ms. Madoriya's employment.

80.     Notably, on August 6, 2024, Mr. Pollack circulated an email informing the firm that PPID was actively seeking an experienced immigration paralegal, highlighting that Ms. Madoriya's termination could not have been due to a lack of work to be done in Ms. Madoriya's department and further suggesting that the purported reasoning behind Defendants' conduct were merely pretext for unlawful motivations.

81.     Incredibly, following Ms. Madoriya's termination, PPID's campaign of retaliation continued.

82.     Specifically, on September 9, 2024, the same day Mr. Pollack terminated Ms. Madoriya's employment, PPID **immediately** cancelled her health insurance benefits. Ms. Madoriya had informed Defendants of her upcoming medical appointments, and PPID's immediate cancellation of her health insurance benefits confirmed that their termination was for the express purpose of avoiding expenses associated with protected medical leave. PPID's cancellation of Ms. Madiroya's benefits caused her to suffer significant damages, including by forcing her to bear the entire financial burden of medical appointments relating to her pregnancy, without insurance.

83.     Despite firing her and cancelling her benefits, PPID failed to provide Ms. Madoriya with notice of and meaningful access to her right to continuation coverage under COBRA or New York State's continuation coverage laws, leaving Ms. Madoriya and her child without health insurance during and after pregnancy for the entire month of September 2024, during which she had scheduled critical testing.

84.     Ms. Madoriya's doctors had scheduled her for a Nuchal Translucency Ultrasound scan—an expensive but important procedure that tests babies for birth defects and genetic disorders—on September 13, 2024.

85.     When Ms. Madoriya requested the scan be rescheduled because PPID had rescinded her health insurance, her doctor informed her that the procedure could only be completed in the first ten to thirteen weeks of pregnancy and Ms. Madoriya was already in her thirteenth week.

86.     Unfortunately, Ms. Madoriya decided to forego the scan because she could not pay for it out of pocket. Thus, PPID's conduct directly deprived Ms. Madoriya of critical medical coverage that directly impacted her baby's health.

87.     Rather than experiencing the anticipation of her pregnancy in a positive, healthy, and supportive environment, Ms. Madoriya was, because of Defendants' retaliatory firing, forced into an extended period of anxiety, financial insecurity, and emotional strain—harms that weighed heavily on her health at a profoundly vulnerable time.

88.     She was suddenly forced to manage her household finances without the salary and health insurance benefits that she should have been afforded had Defendants acted lawfully, all while preparing for the birth of her first child.

89.     The loss of critical medical coverage compounded Ms. Madoriya's anxiety, as she struggled to afford necessary prenatal care and feared for her child's health.

90.     At the same time, Ms. Madoriya was compelled to devote significant time and energy to securing legal counsel, knowing she had been wronged but burdened by the daunting prospect of a legal battle against her former employer—a law firm.

91.     The intersection of financial insecurity, medical vulnerability, and the stress of litigation created an overwhelming environment that no expecting mother should have to endure.

92.     When her child was ultimately born, the baby was undersized and suffered from health complications that could have been detected and mitigated had Ms. Madoriya been provided with the insurance coverage and medical testing to which she was entitled.

93.     Indeed, from PPID's perspective, firing Ms. Madoriya was not punishment enough for her requests for maternity leave and complaining about Ms. Bondikov. Rather than admonish other employees who were engaging in discrimination by continuously asking offensive questions or congratulate Ms. Madoriya on her exciting news, Defendants chose to cut off a pregnant woman's income, health insurance, and professional network—all in the course of a few hours.

94.     On information and belief, Defendants terminated Ms. Madoriya's employment because she was pregnant, because she was female, because she spoke out about other employees' discrimination against her on the basis of her national origin, and/or because of her national origin.

95.     On information and belief, Defendants hired an individual to replace Ms. Madoriya who was not pregnant.

96.     On information and belief, Defendants hired an individual not of Indian national origin and of far lesser experience to replace Ms. Madoriya.

97.     On information and belief, other employees at PPID who were not pregnant were not unjustifiably terminated, like Ms. Madoriya.

98.     On information and belief, other non-female employees at PPID were not unjustifiably terminated, like Ms. Madoriya.

99.     On information and belief, other employees who had not raised complaints about discriminatory conduct in the workplace were not unjustifiably terminated, like Ms. Madoriya.

100.    On information and belief, other PPID employees who *actively engaged* in discriminatory conduct, including Ms. Bondikov, were permitted to keep their employment with PPID, their health insurance, and their continued salary income.

101.    On information and belief, Defendants deviated from typical termination procedures in an effort to exacerbate the harm caused to Ms. Madoriya, including by cutting off her access to critical health insurance.

102.    On information and belief, other similarly situated PPID employees who were not in the same protected classes as Ms. Madoriya were terminated over the course of several days. In the alternative, these individuals were not terminated and then immediately rushed out the door.

**DAMAGES**

16

103.    As a direct and proximate result of Defendants' acts and conduct complained of herein, Ms. Madoriya has suffered and continues to suffer economic loss and financial strain, including lost wages, lost benefits, and out-of-pocket costs and expenses associated with necessary medical care.

104.    Ms. Madoriya has also endured severe emotional pain, stress, distress, suffering, inconvenience, loss of enjoyment of life, disruption of her family life, anguish over her child's health complications and other non-pecuniary losses.

105.    As a further result of Defendants' actions, Ms. Madoriya felt and continues to feel humiliated, degraded, victimized, embarrassed, and emotionally distressed, and she has experienced anxiety and sleeplessness—all while expecting the birth of her first child and beginning her journey as a new mother.

106.    Ms. Madoriya has endured not only personal emotional distress and financial hardship, but also profound anguish at the knowledge that Defendants' unlawful actions and PPID's cancellation of her health insurance jeopardized her pregnancy, forcing her to forego critical prenatal care, which contributed to her child's health complications.

107.    What should have been a time of joy and stability for Ms. Madoriya as she prepared for the arrival of her child was instead marred by Defendants' unlawful retaliation, which thrust her into prolonged stress, uncertainty, and hardship, depriving her of the basic security and dignity to which she was entitled.

108.    Ms. Madoriya was suddenly forced to manage her household finances without the salary and health insurance benefits that she should have been afforded, all while preparing for the birth of her first child. The loss of critical medical coverage compounded her anxiety, as she struggled to afford necessary prenatal care and feared for her child's health. At the same time, she

was compelled to devote significant time and energy to securing competent legal counsel, knowing she had been wronged but burdened by the daunting prospect of a legal battle against her former employer—a law firm. The intersection of financial insecurity, medical vulnerability, and the stress of litigation created an overwhelming environment that no expecting mother should have to endure.

## CAUSES OF ACTION

### Count I – Pregnancy and Sex Discrimination
### (Title VII, as amended by the PDA)

109.    Ms. Madoriya realleges and reincorporates each of the foregoing allegations of this Complaint as if fully set forth herein.

110.    Ms. Madoriya disclosed her pregnancy to Defendants on September 5, 2024.

111.    At the time of her termination, Ms. Madoriya was pregnant.

112.    Ms. Madoriya's pregnancy constituted a physical impairment.

113.    Ms. Madoriya's pregnancy was likely to substantially impair one or more of her major life activities including working.

114.    Defendants perceived Ms. Madoriya's condition as one likely to substantially impair one or more of her major life activities including working.

115.    Defendants treated Ms. Madoriya differently than other similarly-situated employees based on her pregnancy.

116.    On or about September 9, 2024, Defendant terminated Ms. Madoriya's employment without just cause .

117.    As set forth in more detail above, PPID discriminated against Ms. Madoriya on the basis of her pregnancy and sex in violation of Title VII.

118.    PPID terminated Ms. Madoriya's employment because she was pregnant.

18

119.    Defendants terminated Ms. Madoriya's employment because they received notice that she was pregnant.

120.    In the alternative, PPID terminated Ms. Madoriya's employment because she had asked about using her employee benefits, including maternity leave.

121.    Ms. Madoriya has suffered significant emotional distress as a result of Defendants' conduct, and is entitled to emotional distress damages.

122.    As a direct and proximate result of the above conduct, Ms. Madoriya has suffered and will continue to suffer significant damages, including damages, including economic, emotional distress and physical sickness damages.

**Count II – Failure to Accommodate Pregnancy (PWFA)**

123.    Ms. Madoriya realleges and reincorporates each of the foregoing allegations of this Complaint as if fully set forth herein.

124.    Ms. Madoriya informed Defendants of her pregnancy.

125.    Ms. Madoriya requested that Defendants provide her with information regarding a reasonable accommodation for her pregnancy, including maternity leave paperwork and related firm policies, that she was entitled to receive from PPID under the PWFA.

126.    Ms. Madoriya's request for information regarding parental leave and other pregnancy-related accommodations was reasonable.

127.    Providing information on standard firm policies and procedures regarding pregnancy and parental leave would not have been an undue hardship to Defendants.

128.    Instead of accommodating her request for mere information regarding accommodations or otherwise engaging in a discussion about accommodations, Defendants

ignored her request and fired her, which is both a failure to accommodate a pregnancy-related condition and actionable retaliation in violation of the PWFA.

129.    PPID terminated Ms. Madoriya's employment just four days after she notified Defendants about her pregnancy and requested standard information regarding firm policies on parental leave.

130.    Rather than even engage in a discussion of accommodations or congratulate Ms. Madoriya on her exciting news, Defendants terminated her employment and immediately ended her health insurance benefits.

131.    As a direct and proximate result of the above conduct, Ms. Madoriya has suffered and will continue to suffer significant damages, including economic, emotional distress and physical sickness damages.

## Count III: Unlawful Interference With FMLA Rights

132.    Ms. Madoriya realleges and reincorporates each of the foregoing allegations of this Complaint as if fully set forth herein.

133.    Pursuant to 29 U.S.C. § 2601 *et seq*., covered employers are required to provide employees job-protected unpaid leave for qualified medical and family situations.

134.    PPID is a covered employer under the FMLA.

135.    During her employment, Ms. Madoriya qualified for FMLA leave.

136.    During her employment, Ms. Madoriya attempted to request FMLA leave by asking Defendants if she qualified to take parental leave.

137.    Defendants failed to properly advise Ms. Madoriya of her rights under the FMLA.

138.    Defendants unlawfully interfered with Ms. Madoriya's exercise of her rights under the FMLA in violation of Section 105 of the FMLA and section 825.220 of the FMLA regulations.

139.    Defendants' act of terminating Ms. Madoriya immediately after she inquired about taking FMLA leave violated and interfered with Ms. Madoriya's FMLA rights.

140.    Defendants violated section 825.300(c)(1) of the FMLA and interfered with Ms. Madoriya's FMLA rights when Defendants did not honor Ms. Madoriya's attempts to get information about using her FMLA leave.

141.    As a direct and proximate result of Defendants' conduct, Ms. Madoriya is entitled to all damages provided for in 29 U.S.C. § 2617, including liquidated damages, costs and reasonable attorney's fees.

**Count IV – Retaliation (Title VII / PWFA)**

142.    Ms. Madoriya realleges and reincorporates each of the foregoing allegations of this Complaint as if fully set forth herein.

143.    Ms. Madoriya engaged in protected activities while employed at PPID, including, but not limited to, disclosing her pregnancy, requesting information about the process for seeking reasonable accommodations, and complaining about the "caste" comments by her supervisor that were part of a larger pattern of national origin discrimination, in January 2024.

144.    Ms. Madoriya requested maternity leave information and other pregnancy-related accommodations on September 5, 2024, and, yet, within four days was terminated.

145.    Defendants retaliated against her by terminating her employment and cancelling her health benefits.

146.    As a direct and proximate result of Defendants' retaliatory conduct, Ms. Madoriya has suffered and continues to suffer economic damages, including lost wages and benefits; emotional distress, including anxiety, humiliation, and stress; and other consequential damages.

147.    Defendants' retaliation was willful and intentional, entitling Ms. Madoriya to recover compensatory damages, punitive damages, and attorneys' fees under Title VII and the PWFA.

## Count V – National Origin Discrimination (Title VII)

148.    Ms. Madoriya realleges and reincorporates each of the foregoing allegations of this Complaint as if fully set forth herein.

149.    During her employment at PPID, Ms. Bondikov, one of Ms. Madoriya's supervising attorneys, repeatedly asked Ms. Madoriya about her Indian caste, and about the caste of other Indian colleagues. Those questions are undoubtedly discriminatory and tied directly to her national origin as an Indian.

150.    When Ms. Madoriya complained about these discriminatory inquiries, she faced hostility and eventual termination, evidencing Defendants' discrimination against Ms. Madoriya on the basis of her Indian national origin, including caste-based inquiries, in violation of Title VII.

151.    As a direct and proximate result of Defendants' discriminatory conduct, Ms. Madoriya has suffered and continues to suffer economic damages, including lost wages and benefits; emotional distress, including anxiety, humiliation, and mental suffering; and other consequential damages.

152.    Defendants' discriminatory conduct was intentional, willful, and malicious, entitling Ms. Madoriya to recover compensatory damages, punitive damages, and attorneys' fees under Title VII.

## Count VI – Discrimination and Retaliation (NYSHRL)

153.    Ms. Madoriya realleges and reincorporates each of the foregoing allegations of this Complaint as if fully set forth herein.

154.    Defendants discriminated against Ms. Madoriya on the basis of sex, pregnancy, and national origin, and retaliated against her for engaging in protected activity, including reporting discrimination and requesting reasonable accommodations for her pregnancy, in violation of the NYSHRL.

155.    As a direct and proximate result of Defendants' discriminatory and retaliatory conduct, Ms. Madoriya has suffered and continues to suffer economic damages, including lost wages, lost employment benefits, and lost opportunities for advancement, emotional distress and mental anguish, including humiliation, anxiety, and stress, and other consequential damages resulting from the loss of employment and benefits.

156.    Defendants' actions were willful, malicious and in conscious disregard of Ms. Madoriya's rights under the NYSHRL.

157.    As a result of the foregoing, Ms. Madoriya is entitled to all relief available under the NYSHRL, including, but not limited to, compensatory damages for lost wages, benefits, and emotional distress, punitive damages, equitable relief as appropriate, and attorneys' fees and costs.

**Count VII – Discrimination and Retaliation (NYCHRL)**

158.    Ms. Madoriya realleges and reincorporates each of the foregoing allegations of this Complaint as if fully set forth herein.

159.    Defendants discriminated against Ms. Madoriya and treated her less well than other employees because of her sex, pregnancy, and national origin.

160.    For example, Defendants terminated Ms. Madoriya's employment for pretextual "performance issues" a mere four days after she notified them of her pregnancy.

161.    For another example, Defendants failed to take any corrective action in response to Ms. Madoriya's complaint that she was experiencing discrimination on the basis of national origin

in her workplace. By electing to ignore Ms. Madoriya's reports, PPID endorsed discriminatory conduct.

162.    On information and belief, PPID did not terminate the employment of non-pregnant employees.

163.    PPID did not subject non-pregnant employees to heightened scrutiny regarding their performance.

164.    PPID held employees who complained about discrimination to a higher performance standard than those who did not, and penalized them for failing to meet or exceed this heightened standard.

165.    PPID did not treat similarly situated male employees in the same manner as Ms. Madoriya.

166.    Defendants also retaliated against Ms. Madoriya, terminating her employment four days after she disclosed her pregnancy, causing a loss of benefits to which she was entiled, in violation of the NYCHRL.

### Count VIII – ERISA §510 Interference (29 U.S.C. §1140)

167.    Ms. Madoriya realleges and reincorporates each of the foregoing allegations of this Complaint as if fully set forth herein.

168.    Ms. Madoriya participated in PPID's employee welfare benefit plan, including health insurance subject to ERISA.

169.    Defendants intentionally cancelled Ms. Madoriya's health insurance on the same day as her termination for the purpose of interfering with her right to receive ongoing health benefits to which she was entitled, in violation of ERISA §510.

170.    Defendants' cancellation of Ms. Madoriya's coverage was undertaken in bad faith, deliberately timed to coincide with a critical stage of her pregnancy, knowing that she had imminent prenatal testing and medical appointments scheduled with the purpose of interfering with her attainment of rights under her employee benefit plan.

171.    As a direct and proximate result of Defendants' conduct, Ms. Madoriya was deprived of medically necessary care at a critical time in her pregnancy, subjected to severe stress and emotional distress, and her child was ultimately born undersized and with medical complications that likely could have been identified and mitigated with proper health insurance coverage.

172.    Defendants' actions were intentional, willful, and undertaken with deliberate disregard for Ms. Madoriya's rights under ERISA.

173.    As a result of the foregoing, Ms. Madoriya is entitled to all relief available under ERISA, including, but not limited to, restoration of her health benefits and coverage, reimbursement for medical expenses incurred as a result of the coverage lapse, compensatory damages for emotional distress and consequential harm, punitive damages, to the extent available under ERISA, and attorneys fees pursuant to 29 U.S.C. § 1132(g) and other applicable law.

**Count IX – COBRA Notice Violations (ERISA, 29 U.S.C. §§1161–1169)**

174.    Ms. Madoriya realleges and reincorporates each of the foregoing allegations of this Complaint as if fully set forth herein.

175.    Upon her termination, Ms. Madoriya was entitled to meaningful and timely notice of her right to continue group health coverage under COBRA.

176.    Defendants failed to provide Ms. Madoriya with the required COBRA notice following her termination, in a manner that gave her meaningful and timely access to her continuation rights under COBRA, in violation of ERISA, 29 U.S.C. §§1161–1169.

177.    The delay in offering Ms. Madoriya her COBRA notice hindered her ability to elect coverage promptly and in a manner that fully protected her benefits.

178.    Ms. Madoriya lost insurance immediately and was denied the ability to continue coverage for the critical month of September.

179.    Ms. Madoriya is therefore entitled to statutory penalties, reimbursement of uncovered medical costs, and attorney's fees.

### Count X – Failure to Provide Benefits
### (ERISA §502(a)(1)(B), 29 U.S.C. §1132(a)(1)(B))

180.    Ms. Madoriya realleges and reincorporates each of the foregoing allegations of this Complaint as if fully set forth herein.

181.    Ms. Madoriya was a participant in PPID's employee welfare benefit plan, which provided health insurance subject to ERISA.

182.    By wrongfully terminating her employment and immediately cancelling her insurance coverage upon termination, Defendants deprived Ms. Madoriya of health benefits owed under the law firm's plan and of coverage for the critical month of September 2024, when she had important medical tests related to her pregnancy scheduled causing her financial and emotional harm, including exposure to medical expenses without coverage and uncertainty regarding her and her child's healthcare

183.    Defendants' termination and cancellation were made in bad faith, specifically designed to deprive Ms. Madoriya of coverage at a moment when she most required prenatal medical care and benefits.

184.    Ms. Madoriya is therefore entitled to benefits due to her under the terms of the plan, including coverage for prenatal testing and related medical expenses, as well as ongoing medical costs caused by the deprivation of coverage.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Madoriya respectfully requests judgment against Defendants, jointly and severally, as follows:

a.  Declaring that the conduct of Defendants violated Title VII, the PDA, the PWFA, ERISA, COBRA, the NYSHRL, and the NYCHRL;

b.  Issuing a permanent injunction which requires Defendants to abolish discrimination, harassment, and retaliatory practices; requires PPID to allocate significant funding and trained staff to implement all changes within two years; requires removal or demotion of all supervisors who have engaged in discrimination, harassment, or retaliation, and who have failed to meet their legal responsibility to investigate complaints and/or take effective action to stop and deter prohibited conduct; creating a process for prompt investigation of discrimination, harassment, or retaliation complaints; and requiring mandatory and effective training for all employees and supervisors on discrimination, harassment, and retaliation issues, investigations, and appropriate corrective actions;

c.  Issue an order requiring PPID to restore Ms. Madoriya to one of the positions to which she was entitled by virtue of her application and qualifications, and to expunge her personnel file of all negative documentation;

d.  Awarding Ms. Madoriya damages to compensate for back pay, front pay, lost benefits, and other economic damages;

e.  Awarding Ms. Madoriya compensatory damages for physical injury, physical sickness, emotional distress and humiliation, and other consequential damages, in excess of $75,000, in an amount to be proven at trial;

f.  Awarding Ms. Madoriya damages for the harm caused to Ms. Madoriya's pregnancy and resulting health complications of her child in an amount to be proven at trial;

g.  Awarding Ms. Madoriya punitive damages to deter future unlawful conduct by Defendants in an amount in excess of $75,000 to be proven at trial;

h.  Awarding Ms. Madoriya statutory penalties, reimbursement of medical expenses, including for medical expenses incurred as a result of lapse in coverage, equitable relief, and restitution under ERISA and COBRA;

i.  Awarding Ms. Madoriya benefits due under PPID's employee welfare benefit plan pursuant to ERISA §502(a)(1)(B);

j.  Ordering Ms. Madoriya equitable relief under ERISA, including reinstatement of Ms. Madoriya's health insurance coverage and restitution of out-of-pocket medical expenses;

k.  Awarding Ms. Madoriya reasonable attorneys' fees, costs, and disbursements; and

l.  Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Ms. Madoriya demands a trial by jury on all claims and issues so triable.

Dated:  September 1, 2025

Respectfully Submitted,

**TAYLOR DYKEMA PLLC**
*/s/ Edward Andrew Paltzik*

Edward Andrew Paltzik
914 E. 25th Street
Houston, TX 77009
Phone:  516-526-0341
Email:  edward@taylordykema.com

*Counsel for Plaintiff Monika Madoriya*